**Sergeant Markala Moore**
**02/27/2025**

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF MICHIGAN

 3                   SOUTHERN DIVISION

 4

 5   DAQUAN P. JAMES,

 6   an individual,

 7                    Plaintiff,

 8     vs.                       Case No. 2:23-cv-10321

 9                               Hon. Denise Page Hood

10   CITY OF DETROIT,

11   a municipal corporation, and

12   BRITTANY MOSS, City of Detroit

13   Police Officer, Individually and in

14   her Official Capacities, and

15

16   MARKALA MOORE, City of Detroit

17   Police Officer, Individually and in

18   her Official Capacities, and

19

20   DEANDRE WILLIAMS, City of Detroit

21   Police Officer, Individually and in

22   her Official Capacities, and

23

24

25
```



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Sergeant Markala Moore**
**02/27/2025**                                    **Page 2**

1   DAMARIO ELLIOTT-GLENN, City of Detroit

2   Police Officer, Individually and in

3   her Official Capacities, and

4

5   ALLEN WILLIAMS, City of Detroit

6   Police Officer, Individually and in

7   her Official Capacities, and

8                         Defendants.

9   _____/

10  PAGES 1 TO 32

11

12       The Deposition of SERGEANT MARKALA MOORE,

13       Taken at 2 Woodward Avenue,

14       Detroit, Michigan,

15       Commencing at 11:15 a.m.,

16       Thursday, February 27, 2025,

17       Before Tamora L. Thompson, CSR-5378.

18

19

20

21

22

23

24

25



```
 1  APPEARANCES:

 2

 3  IVAN L. LAND, ESQUIRE

 4  Ivan L. Land Law Offices, PC

 5  25900 Greenfield Road, Suite 210

 6  Oak Park, Michigan 48237

 7  (248) 968-4545

 8      Appearing on behalf of the Plaintiff.

 9

10  CALVERT A. BAILEY, ESQUIRE

11  City of Detroit

12  2 Woodward Avenue

13  Detroit, Michigan 48226

14  (313) 224-4550

15      Appearing on behalf of the Defendants.

16

17  ALSO PRESENT:

18  DaQuan James

19  Allen Williams

20

21

22                          *    *    *    *    *

23

24

25
```



```
 1              I N D E X

 2  WITNESS:                              PAGE:

 3  SERGEANT MARKALA MOORE

 4  Examination by Mr. Land                 5

 5  Examination by Mr. Bailey             19

 6  Re-examination by Mr. Land            22

 7  Re-examination by Mr. Bailey          29

 8

 9

10  EXHIBITS:                            MARKED:

11  Exhibit 1      Case Supplemental Report   11

12  Exhibit 2      Audio Recording            18

13  (Retained)

14

15

16

17

18

19

20

21

22

23

24

25
```



1   Detroit, Michigan

2   Thursday, February 27, 2025

3   About 11:15 a.m.

4                        MARKALA MOORE,

5   having first been duly sworn, was examined and testified

6   on her oath as follows:

7                        EXAMINATION

8   BY MR. LAND:

9   Q.   Good afternoon, is it Ms. Markala Moore?

10  **A.   Markala Moore.**

11  Q.   I'm Attorney Ivan Land.  I represent Mr. DaQuan James in

12       the case in the United States District Court, Eastern

13       District of Michigan, Southern Division.  Case number

14       2:23-cv-10321 before the Honorable Denise Page Hood.

15            Can you please state your full name for the

16       record and spell it?

17  **A.   Markala Moore M-A-R-K-A-L-A, Moore M-O-O-R-E.**

18  Q.   Have you ever had your deposition taken before?

19  **A.   Yes.**

20  Q.   So you know this is a question-and-answer session.  I

21       ask the questions, you answer.  And if you don't

22       understand, please don't guess.  Because these questions

23       are important, so you don't want to guess.  Just have me

24       repeat it.

25  **A.   Understood.**



Sergeant Markala Moore
02/27/2025                                          Page 6

1  Q.   Okay?

2  **A.   Yes.**

3  Q.   So are you familiar with this case?

4  **A.   Yes.**

5  Q.   Did you enter Mr. DaQuan James' property?

6  **A.   Yes.**

7  Q.   Did you identify yourself as a police officer?

8  **A.   Yes.**

9  Q.   When you entered the location, you identified yourself

10      as a police officer?

11 **A.   I entered the location.  We were in there for a couple**

12      **of minutes.  He approached us, I identified myself as a**

13      **police officer.**

14 Q.   So did you gain access to the place before you

15      identified yourself as a police officer?

16 **A.   Yes.  He let us in.**

17 Q.   So prior to him letting you in, did you identify

18      yourself as a police officer?

19 **A.   No.**

20 Q.   You did not, okay.  At what point do you believe you

21      identified yourself as a police officer?

22 **A.   When he approached us when we were in the building**

23      **looking at the merchandise.  He came -- I don't remember**

24      **the exact conversation, but at which point we identified**

25      **ourself as police officers.**



1  Q.   Ms. Moore, are you aware that you are under oath?

2  **A.   Yes.**

3  Q.   Okay.  Are you aware that there is video footage?

4  **A.   Yes.**

5  Q.   So for the record, you're stating, at some point, that

6       you identified yourself as a police officer?

7  **A.   Yes.  Me and my partner, we were -- maybe I didn't say**

8       **it exactly.  But we identified ourselves as police**

9       **officers while in the inside of the business.**

10 Q.   Was it before or after the other male officers came?

11 **A.   What do you mean?**

12 Q.   Have you looked at any footage or did anything to

13      prepare yourself for this deposition?

14 **A.   To be honest, not recently.  This was three years ago.**

15      **I have been busy at work.  I haven't had the opportunity**

16      **to look at anything within this past couple week's**

17      **timeframe.**

18 Q.   So you looked at something a couple weeks ago?

19 **A.   No.  I honestly haven't seen this case since it first**

20      **happened which was what, two, three years ago.**

21 Q.   So your memory is not that good about this case?

22 **A.   Not good specific details, but I remember the general of**

23      **what happened.  You asked me did male police officers**

24      **come in.  I asked for you to clarify.  Male police**

25      **officers did end up making entry into the location after**



**Sergeant Markala Moore**
02/27/2025                                        Page 8

1        me and my partner were inside the location.

2   Q.   Right.  So when the male officers were allowed into the

3        location, had you identified yourself as a police

4        officer to Mr. James?

5   A.   **Not me personally.  My partner let him know that we were**

6        **both police officers.**

7   Q.   Before the males came in?

8   A.   **Yes.**

9   Q.   How many minutes before the -- how many seconds before

10       the males came in did you identify, tell Mr. James that

11       you were police officers?

12  A.   **I don't know the exact time.**

13  Q.   Okay.  You don't know.  Let me ask you something.

14            Do you remember if the door was locked or

15       open?

16  A.   **The door was locked.**

17  Q.   So who opened the door?

18  A.   **I opened the door.**

19  Q.   You opened the door.  And you allowed the other police

20       officers in?

21  A.   **Yes.**

22  Q.   Did the other police officers have a warrant?

23  A.   **No.**

24  Q.   What authority did you have to open the door?

25  A.   **So we went in there.  The situation escalated.  We were**



Sergeant Markala Moore
02/27/2025                                        Page 9

1     in plainclothes.  We did notify the males officers to

2     come in.  The door was locked.  I went to open the door

3     to let them in so they could assist us because the

4     situation was becoming hostile.

5  Q.  How did the situation become hostile?

6  A.  I don't remember the exact wording.  We were in there.

7     Mr. James -- it was some kind of banter back and forth.

8     He got upset.  He tried to make us leave at which point

9     my partner let him know we were the police.  He still

10    didn't -- still wanted us to leave.  We called the

11    officers, the male officers.  I went and let them in.

12 Q.  Do you need to go review this footage?

13 A.  If it's available.

14 Q.  Well, you need to talk to your attorney about reviewing

15    the footage.  We are going to keep going.

16         You said the situation got hostile, correct?

17 A.  Yes.

18 Q.  Okay.  What did you fear when it got hostile?

19 A.  Fear?

20 Q.  Yes.  Did you have any fears?

21 A.  Well, he did have a weapon.

22 Q.  He had a weapon on him?

23 A.  Yes.

24 Q.  You knew that?

25 A.  He had it on his waistband.  I seen it.



1   Q.   You seen the weapon on his waistband?

2   **A.   Yes.**

3   Q.   Okay.  You and the officers still remained in there

4        while it was hostile -- got hostile?

5   **A.   Yes.**

6   Q.   Because you didn't pick up the phone and call any of the

7        officers that came in.  Am I correct?

8   **A.   Phone call was made.**

9   Q.   By whom?

10  **A.   I honestly don't know who made the phone call.  Maybe my**

11       **partner made the phone call and handed me the phone or**

12       **something like that.  But I do know officers were on the**

13       **phone.**

14  Q.   Were you inside of the location when this occurred?

15  **A.   Yes.**

16  Q.   So that would be on the video footage?

17  **A.   Yes.**

18  Q.   Okay.  Did you allow the -- did you tell any officers he

19       had a gun?

20  **A.   I don't recall.**

21  Q.   That would be important, wouldn't it?

22  **A.   I know that the officers were alerted.  I can't tell you**

23       **exactly if it was me that told them that information or**

24       **if it was my partner that told them that information.**

25       **But I don't want to say it was one or the other seeing**


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1      as I am under oath.

2  Q.   You don't know.  So if you were alerted -- someone did

3       alert the other officers that Mr. DaQuan James had a

4       weapon?

5  A.   **Yes, my understanding.**

6                       DEPOSITION EXHIBIT 1

7                       WAS MARKED BY THE REPORTER

8                       FOR IDENTIFICATION.

9  Q.   From your understanding, okay.  Now let me show you what

10      is marked as Exhibit 1 of Plaintiff's.  I'll let you

11      take a look at that.  Can you read that into the record?

12 A.   **The whole thing?**

13 Q.   Yes.

14 A.   **May I ask why?**

15 Q.   I'm asking questions of you.

16 A.   **I mean, this is not my report and you say read it on**

17      **record.  I didn't write this.**

18 Q.   It doesn't matter.  I just want to ask you some

19      questions about it.  Just want you to read into the

20      record.

21 A.   **Officer Williams attempted to secure the weapon when**

22      **Mr. James clapped down with his right arm.  At this**

23      **time, Officer Williams delivered a strike to the face**

24      **with closed fist while I delivered strikes to the head**

25      and body of Mr. James, (strikes included a close fist to



Sergeant Markala Moore
02/27/2025                                   Page 12

1      the head and knee strikes to the body).  Mr. James was

2      then pulled out the bathroom and he got on the ground

3      with his hands behind his back and he was handcuffed

4      without further incident.

5   Q.   Okay.  This occurred in the bathroom.  Where were you?

6   **A.   I believe I was -- so it was the lobby.  And then there**

7   **was like a middle area, then there was the area that led**

8   **to the back, if I remember correctly.**

9   **               I would like to say that I was standing in the**

10  **doorway.  If you walk into business, it's like a door**

11  **entrance on the right side.  I believe I was in that**

12  **area.**

13  Q.   Okay.  What did you do when you saw this?

14  **A.   What do you mean?**

15  Q.   What did you do?

16               MR. BAILEY:  Object to foundation.  She didn't

17      say she saw that.  She just read it.

18  BY MR. LAND:

19  Q.   Okay.  So what did you do when this occurred?

20  **A.   I don't recall.  I know that I was in that area.  It was**

21  **pretty fast.**

22  Q.   You were in the area?

23  **A.   Yes.**

24  Q.   Okay.  So a couple seconds ago you testified that you

25      called the officers, or someone called the officers, and



1       informed them about Mr. James having a weapon, okay?

2       These officers entered the location, correct?

3  A.   **Yes.**

4  Q.   After you opened the door, okay?  So if this seat is the

5       door and the seat, for the record, is four feet away

6       from her.  When the officers -- the male officers

7       entered, where was Mr. James standing?

8  A.   **If I recall correctly, right there, there was a door and**

9       **I believe there was another door that led to a different**

10      **area of the location.  Mr. James, from the last I recall**

11      **seeing him, I don't know if there was movement after**

12      **that, was standing somewhere in between or near those**

13      **two doors.  The door to go into the cashier area and**

14      **then another door that kind of went to like a back**

15      **lounge or something.**

16 Q.   Okay.  So I just want you to guess.  How many feet do

17      you think they were away from Mr. James?

18                 MR. BAILEY:  Objection for speculation.

19 BY MR. LAND:

20 Q.   Go ahead.  You can answer it.

21 A.   **From -- so from what point?  When you speaking of the**

22      **proximity, where are the officers at this point?**

23 Q.   I'm asking you.  When they entered the building, how

24      far?

25 A.   **From the point of entry into the building to that back**



1       room, maybe 50 to 100 feet.  I'm not a math expert.  But

2       it's the entrance and then it's the back area.

3   Q.  Okay.  Did the officers draw their guns?

4   A.  **I don't recall.**

5   Q.  You don't recall.  You don't recall if they drew their

6       guns?

7   A.  **No.**

8   Q.  Okay.  So 50 feet.  What is Mr. James -- you said he was

9       unruly prior to the officers being there.  Is Mr. James

10      still unruly when they get there?

11  A.  **From the time they came in, they immediately went and**

12      **addressed Mr. James.  If you looked at the footage --**

13      **and from what I remember, had went to the door and they**

14      **came past me.  So I wasn't near Mr. James at this**

15      **particular time to know exactly what he was doing.**

16  Q.  Okay.  So the officers -- you would have known if the

17      officers had drawn their guns?

18  A.  **I would have known at the time, but I can't guess and I**

19      **can't assume.**

20  Q.  So if officers enter 50 feet away, Mr. James has a gun.

21      They just approached the officers -- the officers just

22      approached Mr. James, no guns drawn.  Put your hands up.

23      You don't remember any of that being said?

24  A.  **Sir, I do not recall exactly what the officers said when**

25      **they entered.  If you looked at the video footage, I go**



1       to the door and open the door, and they immediately go

2       past.  So I don't even have a chance to sit and focus in

3       on either the officers to see exactly what is in their

4       hands or what's not.

5   Q.  Let me ask you this.  Did you hear Mr. James tell them

6       that after they assaulted him that he had a weapon on

7       him?

8   **A.  No.  I'm not saying that he said that, but I didn't hear**

9   **    that.**

10  Q.  Did you agree Mr. James was assaulted with the weapon on

11      him?

12          MR. BAILEY:  Objection to the form of the

13      question.  You didn't establish a foundation that he was

14      assaulted.

15  BY MR. LAND:

16  Q.  Well, let me refer you back to Exhibit 1.  What the

17      officers stated, do you agree what occurred in Exhibit

18      1, Mr. James still had his weapon on him?

19  **A.  Sir, I was not back in that immediate proximity.**

20  Q.  You just said --

21  **A.  I know the weapon was recovered by an officer.  I don't**

22  **    know if you are getting to maybe a point where the**

23  **    weapon was handed off to me and I sat it down.  But I**

24  **    didn't recover the weapon off of Mr. James.  I don't**

25  **    exactly recall when the weapon was taken off of**



1     Mr. James.

2  Q.  You don't recall that, when it was taken off of him?

3  A.  I remember when -- I laid eyes on the weapon and it was

4      in officer's possession.  It was after the assault, if

5      that's what you want to call it.

6  Q.  Yes.  Okay.  You don't remember the officers hollering

7      out he has a gun or anything of that nature?

8  A.  No.  I don't think they would have to if they already

9      knew he had a weapon.

10 Q.  They already knew he had a weapon.  And you don't --

11     they don't have to holler that out.  They already had

12     it.  Give me one second, please.

13          So how many feet do you think you were away

14     from what happened in Exhibit 1?

15 A.  Sir, I don't know.

16 Q.  You can't recall?

17 A.  I cannot tell you how many feet I was away.

18 Q.  You can't tell how many feet?

19 A.  No.  I didn't count the steps.  I don't know exactly how

20     far I was away.  I don't want to get tied into saying if

21     I was 50 feet away.

22          MR. BAILEY:  Just one second.

23          (Discussion off the record.)

24 BY MR. LAND:

25 Q.  So we were saying, you don't know how many feet you were



1      away and you don't want to guess?

**2  A.   Correct.**

3  Q.   Do you remember cameras being in the location?

**4  A.   Cameras, the business cameras?**

5  Q.   Yes.

**6  A.   Yes.**

7  Q.   You remember.  Do you remember you guys seizing the

8      cameras?

**9  A.   Yes.**

10  Q.   The Detroit Police seized the cameras?

**11  A.   Yes.**

12  Q.   Did you have a warrant to seize the cameras?

**13  A.   Yes.**

14  Q.   You had a warrant to seize the cameras?

**15  A.   Let me --**

16  Q.   You are under oath.

**17  A.   I can't say definitively.  But I will say that typically**

**18      is how that would have went is a search warrant would**

**19      have been drafted when we went back to the location.  If**

**20      I do recall correctly -- and I type a lot of warrants.**

**21      I have a lot of cases.  But for this case specifically,**

**22      I believe that I drafted the search warrant.**

23  Q.   You believe you drafted the search warrant?

**24  A.   Yes, if I recall correctly.**

25                    MR. LAND:  Do I have to send you something or



**Sergeant Markala Moore**
**02/27/2025**                                        Page 18

1    can you get me that, Counsel?

2              MR. BAILEY:  You can get it.  But I need you

3    to send me just a request for the search, yes.

4              MR. LAND:  Even though Discovery has ended?

5              MR. BAILEY:  Yes.  I'm going to get it to you,

6    but I need paper.

7  BY MR. LAND:

8  Q.  So you were in the back area when this happened.  In the

9      area you could see this?

10 **A.  Yes, in the area.**

11 Q.  You could see it, okay.  Did you hear an officer state

12     to Mr. Towns, which was other gentleman that was brought

13     in from the outside, shut the fuck up nigga?

14 **A.  No, I don't recall.**

15 Q.  You don't recall.  Did you recall the officers saying

16     you a bitch ass nigga?

17 **A.  No, I don't recall.**

18 Q.  You don't recall?

19             MR. LAND:  Can we go off the record for one

20     second?

21             (Discussion off the record.)

22             MR. LAND:  It's going to be a recording.  I'll

23     send this to you.

24                     DEPOSITION EXHIBIT 2

25                     WAS MARKED BY THE REPORTER



**Sergeant Markala Moore**
**02/27/2025**                                              **Page 19**

1          FOR IDENTIFICATION.

2          (Audio recording played)

3          MR. BAILEY:  Object to the authentication of

4     that.  I don't know if it's been altered.

5          MR. LAND:  Your officers, they supplied it to

6     us.

7  BY MR. LAND:

8  Q.   Do you know whose voice that is?

9  **A.   No, I don't.**

10 Q.   You don't know whose voice that is?

11 **A.   Saying what specifically?  There's a couple different --**

12 Q.   Shut the fuck up, bitch ass nigga?

13 **A.   No, I don't.**

14 Q.   You don't know whose voice that is?

15 **A.   No.**

16          MR. LAND:  I have no further questions.

17                    EXAMINATION

18 BY MR. BAILEY:

19 Q.   Sergeant, I have a couple questions for you.  At any

20     time, did the plaintiff ever attack you or your partner?

21 **A.   Attack?**

22 Q.   Or push put his hand on you or any type of contact?

23 **A.   Yes.**

24 Q.   What type?

25 **A.   Like a shove maybe.  He just facing this way.  If I**



1      recall, it would have been his left arm like a

2      shove or --

3   Q.   What part of your body?

4   A.   My partner was in front of me.

5   Q.   Okay.

6   A.   So it was like he shoved her or maybe not fair to use

7      the word shoved.  But I know there was some disagreement

8      as to us going into the business area to check for

9      licensing and he didn't want us to go back.  So I'll be

10     fair and not say shove.  But arm possibly was out or

11     used his body to stop us from being able to go and

12     conduct the inspection.

13  Q.   And what part of the store were you in at that point

14     where this contact took place?

15  A.   That was right in -- so from the lobby where the

16     merchandise is, going into that middle area that we

17     assumed was the cashier area behind the wall, there was

18     a door right there.  Right there in that doorway.

19  Q.   Okay.  You're familiar with the City Ordinances on

20     business licenses?

21  A.   As far as the licensing that they should have to run a

22     certain business?

23  Q.   Correct.

24  A.   Yes.

25  Q.   And under that ordinance for the business license, does



1      that give you authority to inspect for license, to check

2      the license?

3  A.  Yes.  So part of having a business in the City of

4      Detroit is that you have to comply with business

5      inspections conducted.

6  Q.  And that is the sign that -- you were assigned to Vice

7      at that time?

8  A.  Yes.

9  Q.  Those inspections were conducted by Vice?

10 A.  Yes.

11 Q.  How many inspections a day would you do?

12 A.  Quite a few.  We would do -- so we had, out of a

13     seven-week period, we would have our days where we do

14     inspections.  Whether it would be the sexual oriented

15     businesses, liquor license, gas stations, what have you.

16     So in a day or in a shift, if everything goes normally,

17     we could do maybe ten plus.

18          If we have a mishap or maybe someone doesn't

19     have proper licensing or something of that nature where

20     the business has to be shut down or maybe we have to

21     wait for the business owner to come and be able to

22     provide us with the information we were requesting, that

23     will take us a little bit longer.  That will affect how

24     many we can do.  But on a regular day, if everything

25     goes fine, the average business license inspection,



1        maybe like somewhere between 10 and 30 minutes.

2   Q.   Because of this Ordinance, it was not required for you

3        to get a warrant to do a business license inspection; is

4        that correct?

5                MR. LAND:  Objection.  Calls for legal

6        conclusion.

7   BY MR. BAILEY:

8   Q.   You can go ahead and answer.

9   A.   **That's correct.**

10               MR. LAND:  You finished?

11               MR. BAILEY:  Yes.

12               MR. LAND:  Let the record reflect that Officer

13       Sergeant Allen Williams gave defense counsel a note to

14       ask the question that was just asked.  Let me go over

15       those questions.

16               MR. BAILEY:  Also let the record reflect that

17       plaintiff gave his counsel a note with questions that he

18       was reading off of.

19               MR. LAND:  That's correct.

20                          RE-EXAMINATION

21  BY MR. LAND:

22  Q.   Let me ask you something.  Let's go back to this.

23               You were aware -- first of all, did you ever

24       draw your gun?

25  A.   **I don't recall drawing my gun because I was in**



1      plainclothes, so my gun wasn't exactly that easily

2      assessable.  Now am I saying that in a situation where

3      someone is armed with a weapon that it is impossible?

4      No, I'm not saying that.  But I don't recall pulling my

5      weapon.

6   Q.  Okay.

7   A.  And nor aiming it at Mr. James.

8   Q.  So you don't recall drawing your gun?

9   A.  Right now, I don't recall.  But I'm not saying that's

10      not a possibility.  If it's video footage and I drew my

11      gun, then I 100 percent own up to that because it's not

12      uncommon as a police officer if someone else is armed

13      with a weapon.

14   Q.  Almost definitely not saying you drew your gun.  There

15      is no footage saying that.

16          So again, earlier you testified that you did

17      know that Mr. James had a weapon?

18   A.  Yes.

19   Q.  And now you're saying you got shoved.  It was a hostile

20      situation and you don't know whether or not you drew

21      your gun?

22   A.  I don't recall drawing my gun.  I'm pretty sure I did

23      not draw my gun.  Like I said, this was a couple years

24      ago.  Me being a police officer and doing so many

25      different things in so many different situations on a



1      day-to-day basis, I'm saying that it wouldn't have been

2      uncommon.  But in that situation I do not recall drawing

3      my weapon.

4                  MR. BAILEY:  Can we stop?

5                  (Discussion off the record.)

6  BY MR. LAND:

7  Q.   How long have you been a police officer?

8  A.   Seven years.

9  Q.   Seven years.  Okay.  In what capacity do you work now?

10      You are a sergeant?  I heard you on the phone saying you

11      are a sergeant?

12  A.   Yes.

13  Q.   Congratulations.  Talk about this Vice squad you were

14      on.  You said you were on some kind of Vice squad for

15      the business license?

16  A.   Yes, Vice Enforcement.

17  Q.   Can you explain that to me?

18  A.   What the unit does?

19  Q.   Yes.

20  A.   So under Vice Enforcement, our primary, or their

21      primary, focus is prostitution and human trafficking.

22      My primary focus meaning should an incident like that

23      arise, that would be our priority to handle for that

24      time period.  However long it takes to investigate the

25      complaint.



1            Aside from the prostitution and human

2      trafficking, we check for City Ordinance compliance.  So

3      that can be anywhere that has a liquor license, gas

4      stations, bars, things and such and sexually oriented

5      business.  That can include strip clubs fall under that

6      category, novelty shops.  Those are the main two; the

7      gentleman's clubs and novelty shops.

8   Q.  And what kind of training did you receive for this?

9   A.  I did -- I had human trafficking training.  I don't

10     remember exactly what the training was called.  We all

11     went to human trafficking training.  Other than that,

12     the on-the-job training working with the unit.

13  Q.  So no official training?

14  A.  No.

15  Q.  Okay.  So you just quoted that you're allowed to search

16     a property?

17  A.  No.  Not search.

18  Q.  What are you allowed to?  Excuse me.

19  A.  Conduct a business license inspection.

20  Q.  What does that consist of?

21  A.  That consists of checking for the City of Detroit

22     Business Licensing.  Mainly that's making sure they have

23     the proper paperwork that they need.  I can't recall

24     that now.  I haven't worked Vice in minute.  Back then I

25     knew that it would be the City of Detroit business



Sergeant Markala Moore
02/27/2025                                    Page 26

```
 1        licensing, the fire marshal paperwork.  In this case,

 2        just they wouldn't have a liquor license.  But a liquor

 3        license would be one of those things.

 4   Q.   If they don't have it, then what occurs?

 5   A.   Typically if they don't have one thing or another, we'll

 6        issue a ticket.  If they don't have the City of Detroit

 7        Business License, if they don't have a liquor license

 8        and they are selling liquor, which this wasn't the case

 9        in this instance.  But if it was, then we would

10        essentially shut the -- have the business closed or stop

11        them from selling liquor.

12   Q.   I want to stick with this.  Did Mr. James have a

13        business license?

14   A.   I don't recall.  I don't recall.  So I think a part of

15        the reason we were conducting the inspection or might

16        have been some uncertainty at that point that we were

17        conducting the inspection to see if he did have a

18        business license.

19   Q.   What happened?

20   A.   I believe it turns out that he didn't have the business

21        license in which he was supposed to have.

22   Q.   Did you write him a ticket?

23   A.   I didn't write a ticket.

24   Q.   You didn't?

25   A.   I, personally, didn't write a ticket.
```


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Sergeant Markala Moore**
**02/27/2025**                                      **Page 27**

1  Q.   Did your training or when you went out and conducted

2       these learned on-the-job training, if a person didn't

3       have a license, did it give you just authority to just a

4       search their property if they told you to leave?

5            MR. BAILEY:  Objection.  Mischaracterization.

6       They didn't search.  She was inspecting.

7  BY MR. LAND:

8  Q.   You inspected it.  Do you consider that you ever

9       searched this property?

10 **A.   We did not go in there to search the property.  We went**

11 **in there to conduct a business license inspection.  So**

12 **no, we did not search the property prior to.  After the**

13 **situation happened and then we went back and collected**

14 **the evidence and such.**

15 Q.   So you went back?

16 **A.   Or we stayed at the location and stood by for search**

17 **warrant.**

18 Q.   And Mr. James did tell you to leave because you didn't

19       have a warrant?

20 **A.   If that's what he is saying.  I don't remember his exact**

21 **wording.**

22 Q.   And you didn't leave?

23 **A.   I recall he didn't want us to be there.  I don't recall**

24 **if he said leave because we don't have a search warrant,**

25 **but I do know he didn't want us to be there.**



1  Q.   So what did your training teach you if a person, and

2       individual owner tells you to leave their property?

3       What does your training tell you to do?

4  **A.   Sir, we have established that I didn't say I have**

5       **official training.  In doing the job, to have a business**

6       **in City of Detroit, you have to allow an inspection to**

7       **be conducted.  So at that point, I would more so say**

8       **knowledge-wise, we cannot be refused the right to**

9       **conduct a business inspection.  We are not searching.**

10  Q.   Why not?

11  **A.   Why not what?**

12  Q.   Why can't you be refused to conduct a business search?

13  **A.   Because part of having a business in the City of Detroit**

14       **is complying with inspections, checking for compliance.**

15  Q.   So if they are not in compliance, what do you do?

16  **A.   It depends on the nature of not being in compliance.  I**

17       **said for different businesses it can be different.**

18  Q.   I don't want to talk about --

19  **A.   If we are talking about the City of Detroit --**

20  Q.   We are talking about this business.  That's the subject

21       of this lawsuit.  Excuse me for cutting you off.

22            I'm talking about this case that's the subject

23       of this lawsuit.  If he didn't have a license, what are

24       your duties?

25  **A.   If the inspection is conducted and he does not have a**



1    business license, we typically would issue a ticket for

2    not having the licensing.

3  Q.  Then you issue a ticket and leave?

4  A.  We can issue the ticket and leave.  We can issue the

5    ticket and sometimes, depending on the circumstances,

6    have the business closed.

7  Q.  How do you do that?

8  A.  We tell them that they can't operate and we can call the

9    Building and Safety and they can placard the door in the

10   event that it's one of those situations.

11 Q.  You tell them he can't operate.  Do you have authority

12   to close the business?

13 A.  No.  We call Building and Safety.

14 Q.  They have the authority, so you have to go make a report

15   and submit it to someone?

16 A.  Yes.  You can say that.

17                    MR. LAND:  No further questions.

18                         RE-EXAMINATION

19 BY MR. BAILEY:

20 Q.  Sergeant Moore, when you were doing your inspection, was

21   there anything -- you were looking for this license, the

22   sexually -- what they call it?

23 A.  Sexually oriented business license.

24 Q.  Did you observe anything else going on in that location?

25                    MR. LAND:  Objection, leading.



1             MR. BAILEY:  I didn't say what she observed.

2       I said did you observe, that's a yes or no.

3             MR. LAND:  I'm going to let her answer anyway,

4       Counsel.  You good.

5   BY MR. BAILEY:

6   Q.   Did you observe anything else going on in that location?

7   **A.   Yes.  There was marijuana on the premises.**

8   Q.   And what did you do when you saw that?

9   **A.   In that moment, we didn't do anything.  We left it.**

10  Q.   At this time, was marijuana legal?  Was there -- or

11       required a license at that point?

12            MR. LAND:  Objection.  Calls for speculation.

13  BY MR. BAILEY:

14  Q.   If you know.  For the sale or distribution of marijuana,

15       what is your understanding of licensing at that point in

16       time, March 21?

17            MR. LAND:  Objection, leading.

18            MR. BAILEY:  What was her understanding?  How

19       is that leading?  It's something.

20            MR. LAND:  Go ahead, she can answer it.  I'm

21       just -- do your thing.

22  **A.   I'm sorry.  Can you repeat the question?**

23  BY MR. BAILEY:

24  Q.   Sure.  At that point, March 21, 2022, what was your

25       understanding of licensing in regard to marijuana?



Sergeant Markala Moore
02/27/2025                                    Page 31

1  A.    So we didn't regulate dispensaries.  I don't know the

2        specifics as to what goes into owning a dispensary.  But

3        I know they have their owner set of laws and regulation

4        and such as to having that as far as the marijuana card

5        and what have you.

6  Q.    Do you know that that required a license or not?

7                    MR. LAND:  Objection.  She just said she

8        didn't know.

9                    MR. BAILEY:  That was a different question as

10       to licensing of what was her understanding, okay.

11 BY MR. BAILEY:

12 Q.    And you said at the time you observed that, but you

13       didn't do anything at that time; is that correct?

14 A.    Correct.

15 Q.    Okay.  Did there come a time where something was done?

16 A.    Yes.  After we did the search warrant at the location,

17       the narcotics and stuff were placed on evidence.

18                   MR. BAILEY:  Okay.

19       (The deposition was concluded at 12:00 p.m.)

20

21

22

23

24

25



**Sergeant Markala Moore**
**02/27/2025**                                    **Page 32**

1                    CERTIFICATE OF NOTARY

2

3    STATE OF MICHIGAN          )

4                               ) SS

5    COUNTY OF OAKLAND          )

6        I, Tamora L. Thompson, Certified Shorthand

7    Reporter, a Notary Public in and for the above county

8    and state, do hereby certify that the above deposition

9    was taken before me at the time and place hereinbefore

10   set forth; that the witness was by me first duly sworn

11   to testify to the truth, and nothing but the truth, that

12   the foregoing questions asked and answers made by the

13   witness were duly recorded by me stenographically and

14   reduced to computer transcription; that this is a true,

15   full and correct transcript of my stenographic notes so

16   taken; and that I am not related to, nor of counsel to

17   either party nor interested in the event of this cause.

18

19

20

21            Tamora L. Thompson CSR 5378

22            Notary Public,

23            Oakland County, Michigan

24            My Commission expires:  12-24-2026

25



Sergeant Markala Moore
02/27/2025

1

**1**

**1**  11:6,10 15:16,18 16:14
**10**  22:1
**100**  14:1 23:11
**11:15**  5:3
**12:00**  31:19

**2**

**2**  18:24
**2022**  30:24
**2025**  5:2
**21**  30:16,24
**27**  5:2
**2:23-cv-10321**  5:14

**3**

**30**  22:1

**5**

**50**  14:1,8,20 16:21

**A**

**a.m.**  5:3
**access**  6:14
**addressed**  14:12
**affect**  21:23
**afternoon**  5:9
**agree**  15:10,17
**ahead**  13:20 22:8 30:20
**aiming**  23:7
**alert**  11:3
**alerted**  10:22 11:2
**Allen**  22:13

**allowed**  8:2,19 25:15,18
**altered**  19:4
**approached**  6:12,22 14:21,22
**area**  12:7,12,20,22 13:10,13 14:2 18:8,9,10 20:8,16,17
**arise**  24:23
**arm**  11:22 20:1,10
**armed**  23:3,12
**ass**  18:16 19:12
**assault**  16:4
**assaulted**  15:6,10,14
**assessable**  23:2
**assigned**  21:6
**assist**  9:3
**assume**  14:19
**assumed**  20:17
**attack**  19:20,21
**attempted**  11:21
**attorney**  5:11 9:14
**audio**  19:2
**authentication**  19:3
**authority**  8:24 21:1 27:3 29:11,14
**average**  21:25
**aware**  7:1,3 22:23

**B**

**back**  9:7 12:3,8 13:14,25 14:2 15:16,19 17:19 18:8 20:9 22:22 25:24 27:13,15
**BAILEY**  12:16 13:18 15:12 16:22 18:2,5 19:3,18 22:7,11, 16 24:4 27:5 29:19 30:1,5,13, 18,23 31:9,11,18
**banter**  9:7
**bars**  25:4

**basis**  24:1
**bathroom**  12:2,5
**bit**  21:23
**bitch**  18:16 19:12
**body**  11:25 12:1 20:3,11
**brought**  18:12
**building**  6:22 13:23,25 29:9, 13
**business**  7:9 12:10 17:4 20:8, 20,22,25 21:3,4,20,21,25 22:3 24:15 25:5,19,22,25 26:7,10, 13,18,20 27:11 28:5,9,12,13, 20 29:1,6,12,23
**businesses**  21:15 28:17
**busy**  7:15

**C**

**call**  10:6,8,10,11 16:5 29:8,13, 22
**called**  9:10 12:25 25:10
**Calls**  22:5 30:12
**cameras**  17:3,4,8,10,12,14
**capacity**  24:9
**card**  31:4
**case**  5:12,13 6:3 7:19,21 17:21 26:1,8 28:22
**cases**  17:21
**cashier**  13:13 20:17
**category**  25:6
**chance**  15:2
**check**  20:8 21:1 25:2
**checking**  25:21 28:14
**circumstances**  29:5
**City**  20:19 21:3 25:2,21,25 26:6 28:6,13,19
**clapped**  11:22

clarify 7:24

close 11:25 29:12

closed 11:24 26:10 29:6

clubs 25:5,7

collected 27:13

complaint 24:25

compliance 25:2 28:14,15,16

comply 21:4

complying 28:14

concluded 31:19

conclusion 22:6

conduct 20:12 25:19 27:11
28:9,12

conducted 21:5,9 27:1 28:7,
25

conducting 26:15,17

Congratulations 24:13

consist 25:20

consists 25:21

contact 19:22 20:14

conversation 6:24

correct 9:16 10:7 13:2 17:2
20:23 22:4,9,19 31:13,14

correctly 12:8 13:8 17:20,24

counsel 18:1 22:13,17 30:4

count 16:19

couple 6:11 7:16,18 12:24
19:11,19 23:23

Court 5:12

cutting 28:21

---

**D**

Daquan 5:11 6:5 11:3

day 21:11,16,24

day-to-day 24:1

---

days 21:13

defense 22:13

definitively 17:17

delivered 11:23,24

Denise 5:14

depending 29:5

depends 28:16

deposition 5:18 7:13 11:6
18:24 31:19

details 7:22

Detroit 5:1 17:10 21:4 25:21,
25 26:6 28:6,13,19

disagreement 20:7

Discovery 18:4

discussion 16:23 18:21 24:5

dispensaries 31:1

dispensary 31:2

distribution 30:14

District 5:12,13

Division 5:13

door 8:14,16,17,18,19,24 9:2
12:10 13:4,5,8,9,13,14 14:13
15:1 20:18 29:9

doors 13:13

doorway 12:10 20:18

drafted 17:19,22,23

draw 14:3 22:24 23:23

drawing 22:25 23:8,22 24:2

drawn 14:17,22

drew 14:5 23:10,14,20

duly 5:5

duties 28:24

---

**E**

earlier 23:16

---

easily 23:1

Eastern 5:12

end 7:25

ended 18:4

Enforcement 24:16,20

enter 6:5 14:20

entered 6:9,11 13:2,7,23
14:25

entrance 12:11 14:2

entry 7:25 13:25

escalated 8:25

essentially 26:10

establish 15:13

established 28:4

event 29:10

evidence 27:14 31:17

exact 6:24 8:12 9:6 27:20

EXAMINATION 5:7 19:17

examined 5:5

Excuse 25:18 28:21

Exhibit 11:6,10 15:16,17
16:14 18:24

expert 14:1

explain 24:17

eyes 16:3

---

**F**

face 11:23

facing 19:25

fair 20:6,10

fall 25:5

familiar 6:3 20:19

fast 12:21

fear 9:18,19

fears 9:20



**February** 5:2

**feet** 13:5,16 14:1,8,20 16:13,
  17,18,21,25

**fine** 21:25

**finished** 22:10

**fire** 26:1

**fist** 11:24,25

**focus** 15:2 24:21,22

**footage** 7:3,12 9:12,15 10:16
  14:12,25 23:10,15

**form** 15:12

**foundation** 12:16 15:13

**front** 20:4

**fuck** 18:13 19:12

**full** 5:15

**G**

**gain** 6:14

**gas** 21:15 25:3

**gave** 22:13,17

**general** 7:22

**gentleman** 18:12

**gentleman's** 25:7

**give** 16:12 21:1 27:3

**good** 5:9 7:21,22 30:4

**ground** 12:2

**guess** 5:22,23 13:16 14:18
  17:1

**gun** 10:19 14:20 16:7 22:24,25
  23:1,8,11,14,21,22,23

**guns** 14:3,6,17,22

**guys** 17:7

**H**

**hand** 19:22

**handcuffed** 12:3

**handed** 10:11 15:23

**handle** 24:23

**hands** 12:3 14:22 15:4

**happened** 7:20,23 16:14 18:8
  26:19 27:13

**head** 11:24 12:1

**hear** 15:5,8 18:11

**heard** 24:10

**holler** 16:11

**hollering** 16:6

**honest** 7:14

**honestly** 7:19 10:10

**Honorable** 5:14

**Hood** 5:14

**hostile** 9:4,5,16,18 10:4 23:19

**human** 24:21 25:1,9,11

**I**

**IDENTIFICATION** 11:8 19:1

**identified** 6:9,12,15,21,24 7:6,
  8 8:3

**identify** 6:7,17 8:10

**immediately** 14:11 15:1

**important** 5:23 10:21

**impossible** 23:3

**incident** 12:4 24:22

**include** 25:5

**included** 11:25

**individual** 28:2

**information** 10:23,24 21:22

**informed** 13:1

**inside** 7:9 8:1 10:14

**inspect** 21:1

**inspected** 27:8

**inspecting** 27:6

**inspection** 20:12 21:25 22:3
  25:19 26:15,17 27:11 28:6,9,
  25 29:20

**inspections** 21:5,9,11,14
  28:14

**instance** 26:9

**investigate** 24:24

**issue** 26:6 29:1,3,4

**Ivan** 5:11

**J**

**James** 5:11 8:4,10 9:7 11:3,
  22,25 12:1 13:1,7,10,17 14:8,
  9,12,14,20,22 15:5,10,18,24
  16:1 23:7,17 26:12 27:18

**James'** 6:5

**job** 28:5

**K**

**kind** 9:7 13:14 24:14 25:8

**knee** 12:1

**knew** 9:24 16:9,10 25:25

**knowledge-wise** 28:8

**L**

**laid** 16:3

**Land** 5:8,11 12:18 13:19 15:15
  16:24 17:25 18:4,7,19,22
  19:5,7,16 22:5,10,12,19,21
  24:6 27:7 29:17,25 30:3,12,
  17,20 31:7

**laws** 31:3

**lawsuit** 28:21,23

**leading** 29:25 30:17,19

**learned** 27:2

**leave** 9:8,10 27:4,18,22,24
  28:2 29:3,4



HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

led 12:7 13:9

left 20:1 30:9

legal 22:5 30:10

letting 6:17

license 20:25 21:1,2,15,25 22:3 24:15 25:3,19 26:2,3,7, 13,18,21 27:3,11 28:23 29:1, 21,23 30:11 31:6

licenses 20:20

licensing 20:9,21 21:19 25:22 26:1 29:2 30:15,25 31:10

liquor 21:15 25:3 26:2,7,8,11

lobby 12:6 20:15

location 6:9,11 7:25 8:1,3 10:14 13:2,10 17:3,19 27:16 29:24 30:6 31:16

locked 8:14,16 9:2

long 24:7,24

longer 21:23

looked 7:12,18 14:12,25

lot 17:20,21

lounge 13:15

M

M-A-R-K-A-L-A 5:17

M-O-O-R-E 5:17

made 10:8,10,11

main 25:6

make 9:8 29:14

making 7:25 25:22

male 7:10,23,24 8:2 9:11 13:6

males 8:7,10 9:1

March 30:16,24

marijuana 30:7,10,14,25 31:4

Markala 5:4,9,10,17

marked 11:7,10 18:25

marshal 26:1

math 14:1

matter 11:18

meaning 24:22

memory 7:21

merchandise 6:23 20:16

Michigan 5:1,13

middle 12:7 20:16

minute 25:24

minutes 6:12 8:9 22:1

Mischaracterization 27:5

mishap 21:18

moment 30:9

Moore 5:4,9,10,17 7:1 29:20

movement 13:11

N

narcotics 31:17

nature 16:7 21:19 28:16

nigga 18:13,16 19:12

note 22:13,17

notify 9:1

novelty 25:6,7

number 5:13

O

oath 5:6 7:1 11:1 17:16

Object 12:16 19:3

Objection 13:18 15:12 22:5 27:5 29:25 30:12,17 31:7

observe 29:24 30:2,6

observed 30:1 31:12

occurred 10:14 12:5,19 15:17

occurs 26:4

officer 6:7,10,13,15,18,21 7:6 8:4 11:21,23 15:21 18:11 22:12 23:12,24 24:7

officer's 16:4

officers 6:25 7:9,10,23,25 8:2, 6,11,20,22 9:1,11 10:3,7,12, 18,22 11:3 12:25 13:2,6,22 14:3,9,16,17,20,21,24 15:3,17 16:6 18:15 19:5

official 25:13 28:5

on-the-job 25:12 27:2

open 8:15,24 9:2 15:1

opened 8:17,18,19 13:4

operate 29:8,11

opportunity 7:15

ordinance 20:25 22:2 25:2

Ordinances 20:19

oriented 21:14 25:4 29:23

ourself 6:25

owner 21:21 28:2 31:3

owning 31:2

P

p.m. 31:19

paper 18:6

paperwork 25:23 26:1

part 20:3,13 21:3 26:14 28:13

partner 7:7 8:1,5 9:9 10:11,24 19:20 20:4

past 7:16 14:14 15:2

percent 23:11

period 21:13 24:24

person 27:2 28:1

personally 8:5 26:25

phone 10:6,8,10,11,13 24:10

pick 10:6


HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

placard 29:9

place 6:14 20:14

plainclothes 9:1 23:1

plaintiff 19:20 22:17

Plaintiff's 11:10

played 19:2

point 6:20,24 7:5 9:8 13:21,22,
25 15:22 20:13 26:16 28:7
30:11,15,24

police 6:7,10,13,15,18,21,25
7:6,8,23,24 8:3,6,11,19,22 9:9
17:10 23:12,24 24:7

possession 16:4

possibility 23:10

possibly 20:10

premises 30:7

prepare 7:13

pretty 12:21 23:22

primary 24:20,21,22

prior 6:17 14:9 27:12

priority 24:23

proper 21:19 25:23

property 6:5 25:16 27:4,9,10,
12 28:2

prostitution 24:21 25:1

provide 21:22

proximity 13:22 15:19

pulled 12:2

pulling 23:4

push 19:22

put 14:22 19:22

Q

question 15:13 22:14 30:22
31:9

question-and-answer 5:20

questions 5:21,22 11:15,19
19:16,19 22:15,17 29:17

quoted 25:15

R

RE-EXAMINATION 22:20
29:18

read 11:11,16,19 12:17

reading 22:18

reason 26:15

recall 10:20 12:20 13:8,10
14:4,5,24 15:25 16:2,16
17:20,24 18:14,15,17,18 20:1
22:25 23:4,8,9,22 24:2 25:23
26:14 27:23

receive 25:8

recently 7:14

record 5:16 7:5 11:11,17,20
13:5 16:23 18:19,21 22:12,16
24:5

recording 18:22 19:2

recover 15:24

recovered 15:21

refer 15:16

reflect 22:12,16

refused 28:8,12

regard 30:25

regular 21:24

regulate 31:1

regulation 31:3

remained 10:3

remember 6:23 7:22 8:14 9:6
12:8 14:13,23 16:3,6 17:3,7
25:10 27:20

repeat 5:24 30:22

report 11:16 29:14

REPORTER 11:7 18:25

represent 5:11

request 18:3

requesting 21:22

required 22:2 30:11 31:6

review 9:12

reviewing 9:14

room 14:1

run 20:21

S

Safety 29:9,13

sale 30:14

sat 15:23

search 17:18,22,23 18:3
25:15,17 27:4,6,10,12,16,24
28:12 31:16

searched 27:9

searching 28:9

seat 13:4,5

seconds 8:9 12:24

secure 11:21

seize 17:12,14

seized 17:10

seizing 17:7

selling 26:8,11

send 17:25 18:3,23

sergeant 19:19 22:13 24:10,
11 29:20

session 5:20

set 31:3

seven-week 21:13

sexual 21:14

sexually 25:4 29:22,23

shift 21:16

shops 25:6,7

HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

shove 19:25 20:2,10

shoved 20:6,7 23:19

show 11:9

shut 18:13 19:12 21:20 26:10

side 12:11

sign 21:6

Sir 14:24 15:19 16:15 28:4

sit 15:2

situation 8:25 9:4,5,16 23:2, 20 24:2 27:13

situations 23:25 29:10

Southern 5:13

speaking 13:21

specific 7:22

specifically 17:21 19:11

specifics 31:2

speculation 13:18 30:12

spell 5:16

squad 24:13,14

standing 12:9 13:7,12

state 5:15 18:11

stated 15:17

States 5:12

stating 7:5

stations 21:15 25:4

stayed 27:16

steps 16:19

stick 26:12

stood 27:16

stop 20:11 24:4 26:10

store 20:13

strike 11:23

strikes 11:24,25 12:1

strip 25:5

stuff 31:17

subject 28:20,22

submit 29:15

supplied 19:5

supposed 26:21

sworn 5:5

---

**T**

takes 24:24

talk 9:14 24:13 28:18

talking 28:19,20,22

teach 28:1

tells 28:2

ten 21:17

testified 5:5 12:24 23:16

thing 11:12 26:5 30:21

things 23:25 25:4 26:3

Thursday 5:2

ticket 26:6,22,23,25 29:1,3,4,5

tied 16:20

time 8:12 11:23 14:11,15,18 19:20 21:7 24:24 30:10,16 31:12,13,15

timeframe 7:17

told 10:23,24 27:4

Towns 18:12

trafficking 24:21 25:2,9,11

training 25:8,9,10,11,12,13 27:1,2 28:1,3,5

turns 26:20

type 17:20 19:22,24

typically 17:17 26:5 29:1

---

**U**

uncertainty 26:16

uncommon 23:12 24:2

understand 5:22

understanding 11:5,9 30:15, 18,25 31:10

Understood 5:25

unit 24:18 25:12

United 5:12

unruly 14:9,10

upset 9:8

---

**V**

Vice 21:6,9 24:13,14,16,20 25:24

video 7:3 10:16 14:25 23:10

voice 19:8,10,14

---

**W**

waistband 9:25 10:1

wait 21:21

walk 12:10

wall 20:17

wanted 9:10

warrant 8:22 17:12,14,18,22, 23 22:3 27:17,19,24 31:16

warrants 17:20

weapon 9:21,22 10:1 11:4,21 13:1 15:6,10,18,21,23,24,25 16:3,9,10 23:3,5,13,17 24:3

week's 7:16

weeks 7:18

Williams 11:21,23 22:13

word 20:7

wording 9:6 27:21

work 7:15 24:9

worked 25:24

working 25:12



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**write**  11:17 26:22,23,25

---

**Y**

---

**years**  7:14,20 23:23 24:8,9